SCOTT E. BRADFORD, OSB # 062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB # 965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 3:25-CR-00484-AN** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **CURTIS LEE WATERS,** | |
| **Defendant.** | |

The government asks the Court to impose a sentence of 84 months' imprisonment, to be followed by a four-year term of supervised release. The defendant, who has pled guilty to selling fentanyl, an incredibly addictive, destructive, and deadly drug, comes before the Court with prior convictions in both state and federal court for distributing drugs. Defendant's prior arrests and convictions did nothing to deter him. Given the seriousness of his offense, his criminal history, and his ongoing pattern of criminal activity, the government believes such a sentence is reasonable.

///

**A. Summary of Proceedings.**

On May 27, 2026, the defendant pled guilty to Count 1 of his indictment, which charged him with the felony crime of Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B). The maximum sentence the Court may impose is a term of 40 years' imprisonment, a fine of $5,000,000, and at least four years of supervised release. There is also a mandatory minimum sentence of five years' imprisonment. The count of conviction carries a $100 fee assessment.

In his Plea Agreement defendant admitted that:

> [O]n or about October 22, 2025, here within the District of Oregon, he was caught in possession of approximately 182 grams of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, and that the fentanyl was possessed for purposes of further distribution. Trained drug investigators would also testify that based upon their observations of the defendant conducting a series of hand-to-hand transactions with apparent drug customers prior to his arrest and the amount of fentanyl seized all indicated that the fentanyl was possessed for purposes of further distribution.

Plea Agreement ¶ 6.

The defendant was a prolific Eastside Portland fentanyl and methamphetamine dealer who was regularly operating in the area of SE 148th and SE Stark, in Portland, Oregon. The facts below are gathered from the Criminal Complaint, the Government's Motion for Continued Pretrial Detention, the investigative reports, and the Presentence Report.

As part of the investigation being conducted by the Multnomah County Sheriff's Office – Special Investigations Unit (SIU), on October 18, 2025, U.S. Magistrate Judge Youlee Yim You authorized a series of search warrants for the defendant, his apartment,

a detached garage, and two of his vehicles. On October 22, 2025, investigators with the Multnomah County Sheriff's Office Special Investigations Unit and FBI executed those search warrants.

Investigators had set up surveillance on the strip mall located at SE 148th and SE Stark in Portland, Oregon, the area where they had previously observed the defendant dealing fentanyl. Investigators observed the defendant drive into the parking lot. Once he parked, investigators observed that a number of people, who appeared drug affected, approached his vehicle. Investigators observed that these people began entering defendant's vehicle one at a time, staying for a short period of time, and then leaving. Based upon the circumstances, the investigators believed these people were purchasing fentanyl from the defendant.

Investigators then drove into the parking lot, contacted the defendant, and detained him. A customer who was in the defendant's car was also detained. The defendant was wearing a black sling bag across the front of his body. As an investigator prepared to read the defendant his constitutional *Miranda* rights from a printed card, he interrupted and began to recite the *Miranda* admonishment himself. The defendant did not finish but when asked he said he understood his rights. The investigators then read the defendant his *Miranda* rights and the defendant again said he understood his rights. The defendant also consented to a search of his car.

Investigators searched the defendant's sling bag and his person and located loose U.S. currency, a plastic container containing multiple chunks of suspected fentanyl powder, suspected methamphetamine, and blue M-30 pills suspected to contain fentanyl. In the defendant's

Cadillac, investigators also located additional fentanyl inside a plastic bag, loose fentanyl chunks, two digital gram scales covered in what appeared to be fentanyl powder residue, and empty plastic baggies suitable for drug packaging. Investigators also noted what appeared to be powdered fentanyl residue on many surfaces of the vehicle.

Investigators then transported the defendant to his residence. During the drive back to his residence, when asked, the defendant denied there were any additional drugs or guns in his residence. The defendant admitted there would be cash at his residence. The defendant told investigators that he had all his drugs with him. The defendant said he did not know how much fentanyl he had with him at the time of his arrest.

Investigators then served the search warrant on the defendant's residence. There was no one inside. During the search of the defendant's residence investigators located drugs in the defendant's bedroom. The defendant then volunteered that there was some fentanyl in his bedroom. The defendant walked into the bedroom and showed investigators where the fentanyl was inside a bag hanging on a wire shelf. Inside the bag, investigators recovered fentanyl.

Investigators continued searching the apartment and located additional fentanyl powder, blue M-30 fentanyl pills, methamphetamine, and 15 rounds of 9mm ammunition. U. S. currency was found in numerous locations in the defendant's bedroom, which after it was counted totaled $10,998.

Investigators then asked the defendant about firearms and the ammunition. The defendant said the ammunition was left over when his firearm was previously seized from him by police. Three handgun holsters were also located inside the residence. The defendant told

investigators that he buys 1,000 blue M-30 fentanyl pills (what is known as a "boat") for $950, but told me he does not sell them, he just gives them away.

Investigators transported the seized evidence to the SIU office and weighed the fentanyl, blue M-30 fentanyl pills, and the methamphetamine. The fentanyl, including the packaging it was seized in, weighed approximately 182.4 grams. The methamphetamine, including the packaging it was seized in, weighed approximately 95.7 grams. Samples of the fentanyl and methamphetamine were tested using a field test, and the tests indicated a presumptive positive for their respective substances. From their training and experience, investigators knew that the quantities of drugs seized indicated that they were possessed for purposes of further distribution.

Some of the methamphetamine and fentanyl pills that were seized at the defendant's residence are pictured below.





The defendant was lodged in jail on federal charges.

On October 23, 2025, a criminal complaint was filed. Later that same day, investigators monitored recorded jail calls that were made by the defendant to a female he identified at the time of his arrest as his wife (WIFE). WIFE resides with the defendant in the apartment where the search warrant was served. In a series of phone calls, the defendant directed WIFE to go to a

car parked in front of the apartment. He explained where the keys to the car were. The defendant told WIFE to retrieve three backpacks in the car that he said were full of cash. The defendant told her to retrieve a bag from under the front seat with a "thing" in it. The defendant directed WIFE to take the items to his mother's house for safekeeping.

The same day investigators went to the defendant's mother's residence located on NE Prescott Street, in Portland, Oregon. The defendant's mother allowed investigators into the residence and signed a consent to search form. Investigators located two bags with bulk U.S. currency in them and a separate bag inside of one of the other bags. Inside one of these bags, along with cash, investigators also found the same three holsters that they had previously seen in the defendant's residence the day before. In the third bag, investigators located a Springfield XD-9 9mm pistol with serial number BA252820. The firearm was loaded with ammunition in the magazine. The items were seized as evidence and the firearm is shown below:



In total, from both defendant's residence and the two bags seized from his mother's residence, investigators seized approximately $28,848 in cash.

Also found at the mother's residence was a safe associated to the defendant, inside of which investigators found more than $60,000.



On November 18, 2025, the defendant was indicted by the federal grand jury. He has remained in custody since his initial arrest.

A Presentence Report (PSR) has been completed. Sentencing is currently set for September 10, 2026. The government believes that the summary facts underlying the defendant's count of conviction (PSR ¶¶ 19 – 28), his Sentencing Guideline calculations (PSR ¶¶ 33 – 42), and his criminal history (PSR ¶¶ 45 – 54) are accurately laid out in the PSR.

**B. Sentencing Guideline Calculations.**

**Base Offense Level**

The parties agree that defendant's relevant conduct based upon the amount of fentanyl and methamphetamine seized, pursuant to U.S.S.G. §§ 1B1.3 and 2D1.1(a), results in an initial Base Offense Level of 26. PSR ¶ 33, Plea Agreement ¶ 8.

///

**Firearm Adjustment**

Because defendant possessed a firearm, pursuant to U.S.S.G. § 2D1.1(b)(1), both the government and U.S. Probation Office believe that defendant's initial Base Offense Level should be increased by two levels. PSR ¶ 34, Plea Agreement ¶ 9.

Under the Sentencing Guidelines, "[i]f a dangerous weapon (including a firearm) was possessed, increase [the base offense] by 2 levels." U.S.S.G. § 2D1.1(b)(1). The dangerous weapon/firearm enhancement, also referred to as the "gun bump," is designed to reflect "the increased danger of violence when drug traffickers possess weapons" and "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n.11(A)); *United States v. Restrepo*, 884 F.2d 1294, 1296 (9th Cir. 1989) ("the language of the Guidelines does *not* require that a *connection* be shown. Rather, it requires only that the weapon be *possessed* during commission of the offense.") (emphasis in original).

The "defendant need not be carrying a weapon when he is arrested" for the enhancement to apply so long as the possession of the firearm was within the scope of the overall offense conduct. *United States v. Lopez-Sandoval*, 146 F.3d 712, 714-15 (9th Cir. 1998) (enhancement applied where defendant was arrested after conducting a drug deal and subsequent search warrant found a small amount of additional drugs and two firearms at his residence); *United States v. Willard,* 919 F.2d 606, 609 (9th Cir. 1990) (enhancement appropriate even where the defendant, who had been involved in drug dealing for two to three years, was arrested in his car without any weapons, but the police later found thirty-one firearms at his place of business).

Here, the defendant was an active drug dealer, and although he did not have the firearm with him when arrested, he clearly possessed it during the scope of his ongoing drug dealing activities. A search of defendant's residence found three handgun holsters, ammunition, digital scales, cash, and drugs. PSR ¶ 25. After listening to some jail calls, investigators learned that the defendant directed a woman to remove three backpacks from a vehicle and take them and a "thing" to his mother's place. PSR ¶ 26. A subsequent search of his mother's residence found three backpacks: two contained a large amount of cash, and the third contained a loaded firearm. PSR ¶ 27. The backpacks were next to a safe belonging to the defendant that also contained additional cash. Here, the defendant clearly possessed a firearm in connection with this overall drug trafficking offense. Thus, the enhancement should apply.

**Acceptance of Responsibility**

Because the defendant fully admitted and accepted responsibility, under U.S.S.G. § 3E1.1, for his unlawful conduct in this case, the government will recommend a three-level reduction in his offense level. PSR ¶¶ 40 – 41, Plea Agreement ¶ 13.

Accordingly, with an Adjusted Offense Level of 25 and a Criminal History Category of IV, defendant's advisory sentencing guideline range is between 84 to 105 months' imprisonment.

**C. Government's Recommended Sentence.**

Pursuant to 18 U.S.C. § 3553(a), the government asks the Court to impose the sentence of 84 months' imprisonment, to be followed by a four-year term of supervised release. The U.S. Probation Office has made the same recommendation. PSR * 1.

According to the Judicial Sentencing Information (JSI) the average length of imprisonment imposed in similar cases is 74 months and the median sentence is 76 months. PSR

* 2. Here, given the nature of the crime and defendant's prior criminal history – both the convictions that receive "points" under the Sentencing Guidelines and those that do not – the government believes an 84 month term of imprisonment is warranted.

The defendant was an armed drug dealer selling fentanyl – an incredibly addictive, destructive, and deadly drug that has been devastating the District of Oregon. According to law enforcement:

> Fentanyl and methamphetamine remain the primary drug threats, affecting community livability and contributing to drug-related overdose deaths and criminal activity, including crimes against persons and property in the HIDTA region. In 2023, fentanyl was linked to 75.9% of overdose deaths in Oregon and 51% in Idaho. Methamphetamine was present in 63.5% of Oregon's overdose deaths and 38% of Idaho's. Together, these two substances accounted for 41.3% of overdose fatalities in both states.

OREGON-IDAHO HIGH INTENSITY DRUG TRAFFICKING AREA (HIDTA) 2026 THREAT ASSESSMENT, 2025, at 5 (https://oridhidta.org/reports).

The death toll from fentanyl is truly frightening. For Americans aged 18 to 45, overdoses – primarily the result of illicit fentanyl – remain the leading cause of death. *CDC Reports Nearly 24% Decline in U.S. Drug Overdose Deaths*, CDC NEWSROOM (Feb. 25, 2025); *DEA Administrator on Record Fentanyl Overdose Deaths,* GET SMART ABOUT DRUGS (August 17, 2024). In 2022, within the United States, fentanyl was responsible for an average of more than 200 deaths every day, and a total of 73,654 people died from fentanyl overdoses. *Are Fentanyl Overdose Deaths Rising in the U.S.*, USAFACTS (Sept. 27, 2023). Here in Oregon, between 2015 and 2021, Oregon experienced a 932% increase in fentanyl overdose deaths. *Fentanyl by State Report*, FAMILIES AGAINST FENTANYL (Feb. 4, 2023). In 2022, Oregon alone experienced a total of 839 fentanyl-related overdose deaths. OREGON HEALTH AUTHORITY OREGON DEPARTMENT OF EDUCATION FENTANYL & OPIOID RESPONSE TOOLKIT FOR SCHOOLS (January

2024). In 2023, within Oregon there were 1,833 overdose deaths, and 1,272 of those were the result of synthetic opioids, such as illicit fentanyl. *Oregon Overdose Prevention Dashboard*, OREGON HEALTH AUTHORITY (May 1, 2025). In 2023, "Oregon had the highest rate of increase in fentanyl deaths in the nation with a one-year increase of more than 67[%], compared to a national average of 5[%]." *Oregon, Washington see largest increases in fentanyl deaths since last year*, KPTV 12 (Sept. 26, 2023).

Even with the most recent decreases in overdose deaths, both nationally and in Oregon, "[f]entanyl continues to be the primary cause of drug overdose deaths in the United States," to include here within Oregon. *Fentanyl Continues to Be the Leading Cause of Overdose Deaths. What's Being Done to Combat Trafficking into the United States?,* WATCHBLOG: FOLLOWING THE FEDERAL DOLLAR, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (Sept. 4, 2025); *Oregon overdose deaths are down, CDC data shows,* OREGON HEALTH AUTHORITY (May 16, 2025) (While "Oregon's overdose deaths decreased 22% between December 2023 and December 2024, a trend similar to that experienced nationwide . . . The count is still much higher than pre-pandemic years, with 1,480 deaths within that one-year time span, CDC data show."); *U.S. Overdose Deaths Decrease Almost 27% in 2024,* NATIONAL CENTER FOR HEALTH STATISTICS, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) (May 14, 2025) (https://www.cdc.gov/nchs/pressroom/ releases/20250514) (in 2024 "there were there were an estimated 80,391 drug overdose deaths in the United States – a decrease of 26.9% from the 110,037 deaths estimated in 2023," and of those deaths in 2023, 76,282 involved synthetic opioids (fentanyl) and in 2024, 48,422 involved synthetic opioids (fentanyl)).

Furthermore, defendant comes before the Court with a lengthy criminal history, which includes three prior state convictions for the delivery of a controlled substance, as well as a prior federal conviction for Possession with Intent to Distribute Cocaine Base. PSR ¶¶ 45, 46, 47, and 48. The defendant's prior state felony convictions are for:

1996 Delivery of a Controlled Substance, PSR ¶ 45;

2005 Delivery of a Controlled Substance, PSR ¶ 46;

2006 Delivery/Manufacture of a Controlled Substance, PSR ¶ 47;

2016 Criminal Mistreatment in the First Degree, PSR ¶ 50; and,

2024 Felon in Possession of a Weapon, PSR ¶ 54.

The defendant's two prior federal felony convictions are:

2007 Possession with Intent to Distribute Cocaine Base, PSR ¶ 48; and,

2011 Escape, PSR ¶49.

The defendant also has a 2017 state misdemeanor conviction for giving false information to a police officer and a 2018 conviction for resisting arrest. PSR ¶¶ 51, 52.

Given the span of time in which the defendant accumulated his prior convictions, many of them do not "score" for criminal history points. Of the four drug dealing convictions, only the federal one results in criminal history points being added under the Sentencing Guidelines. Although the three state drug dealing convictions do not score for criminal history purposes, they should be taken into consideration in determining an appropriate sentence, and here they warrant a sentence above the average length of imprisonment as outlined in the JSI data. Those four drug dealing convictions clearly demonstrate that the defendant, despite previous

convictions and punishment, has failed to be deterred from drug dealing and warrants a sentence above the 60-month mandatory minimum sentence required by law.

Accordingly, after evaluating the competing sentencing factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense; the defendant's characteristics; the need for the sentence imposed to reflect the seriousness of the offense; the need for the sentence to promote respect for the law; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to provide just punishment for the offense; the need to protect the public from further crimes of the defendant; and the need to provide defendant with needed training or other corrective treatment, we ask the Court to impose a sentence of 84 months' imprisonment, to be followed by a four year term of supervised release. We believe such a sentence is reasonable and warranted under the circumstances.

At the time of sentencing we will ask the Court to dismiss Counts 2 and 3.

There is an appeal waiver.

Dated: September 4, 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ Scott Kerin
SCOTT M. KERIN, OSB # 965128
Assistant United States Attorney